Jimmy Hardaway, Jr., Larry A. Boyd, et al. And Brian B. C. McGinty, State Defendant, as well. Hello again. May it please the Court, Esther Murdujeva for the State Defendant. New York properly designated places of worship as sensitive locations in which firearms could not be carried, and the injunction should be reversed. We make a threshold step one argument in our brief, but this morning I'd like to focus on the District Court's errors in evaluating the State's historical evidence. The State met any burden to support the place of worship provision in two different ways. First, the State's expert identified numerous direct historical predecessors for prohibitions on firearms in places of worship. And second, the State's expert explained how places of worship are relevantly similar to other types of historically recognized sensitive locations. The District Court erroneously discarded the State's highly pertinent evidence based on various categorical rules that have no basis in ruin and are illogical as a method of historical study. I'll begin with the first limitation that was imposed by the District Court. The District Court concluded that historic sensitive places are limited to those that implicate key features of democracy. That is a term that appears nowhere in Bruin. It appears nowhere in Heller. And for good reason. Both of those cases recognize that locations such as schools are historically recognized as sensitive, and schools obviously do not implicate key features of democracy. There is also no basis for such a limitation in the historical record, as the historical record includes numerous prohibitions on carrying firearms in places like ballrooms or gatherings for educational, social, or literary purposes. Again, these do not implicate key features of democracy. Next, the Court imposed an amorphous and somewhat undefined- I'm not sure why you want to give that away. I would think that schools are pretty essential to democracy, and maybe churches too. Churches are the religious equivalent of the secular places that you just mentioned, that are gatherings for literary, et cetera, purposes, social, literary, artistic. Churches are at least that, and more so, because of the importance of religious observance. Well, Your Honor, I guess I was disputing the District Court's definition of key functions of democracy, which seem to be limited to things like the operation of governmental entities. That is simply much too narrow to be a classification or a description for the types of locations that have been found sensitive. But more importantly, Your Honors, we did identify numerous historic prohibitions on firearms in places of worship. Bruin states that the state is not required to identify historical twins at all, and we agree. But in this case, we have numerous historical twins. And what the District Court concluded is that the state failed to meet some amorphous, continuous, or enduring tradition standard. And is that your conception of what makes this a sensitive place? Is it based, I don't know if you're relying primarily on this historical analysis, or characteristics that are analogous to the sort of memed sensitive places? How do we determine not just whether or not places of worship are sensitive places, but generally how do we make that determination of what is a sensitive place? Sure, there are two different pathways, Your Honor. A sensitive place can be sensitive because it is identical to historical sensitive place locations, or independently, because it shares features of relevant similarity with other historical places. Places of worship satisfy both tests. In this case, we have numerous examples of historical prohibitions on carrying firearms in places of worship. But again, the court discounted because it concluded they were not enduring enough, or because it concluded that 19th century examples are irrelevant, neither of which are supported by Bruin. Or because places of worship share these features, these similar features with other historical places, such as the ones that Your Honor was referring to that protect the exercise of constitutional rights. There are historical sensitive places that protect vulnerable populations that are concentrated in a particular place, as they are in churches. And there are historical sensitive place restrictions that are focused on the particular risk that use of firearms present in particularly crowded areas with limited forms of egress. Not only does that pose a heightened risk of gun-related injury or death, but it can create risk of chaos or panic from the presence of firearms. So in this case, either one of those paths apply. There may be other cases where one path makes more sense than another. But either one is a way to establish a historical tradition for sensitive place regulation. One feature of the district court's reasoning that was particularly erroneous is its refusal to consider post-founding laws as relevant evidence of the nation's historical tradition of firearms. Bruin only authorizes diminishing post-founding laws if there is an affirmative conflict with earlier law. No such conflict exists here. What the plaintiffs have pointed to are several colonial rules that required bringing a gun to church. But a government mandate is not the same thing as a constitutional right. The 11th Circuit recently clarified that in the Bondi case, which presented a very similar circumstance. In that case, the challenge was to an age limitation on the possession of firearms. And the court said there is no conflict between that rule and colonial-era regulations that require people of a certain age to muster for a militia. And that is because the plaintiffs there were confusing a legal obligation with a constitutional right. Merely by regulating conduct, the government does not create a constitutional right to the conduct that is being regulated. In addition, the district court categorically discarded many local laws. Several of the provisions that the state cited were regulations enacted by localities. And that is deeply and fundamentally problematic when you're trying to ascertain the nation's historical tradition of firearms regulation. It was localities that, for most of this nation's history, were tasked with regulating for public safety. It was localities that would have been tasked with regulating things like the presence of firearms in particularly sensitive locations. By categorically dismissing this evidence, the court actually narrowed the historical record into something that no longer reflects an accurate understanding of the historical regulation of firearms in this country. One last point that I'd like to address about the arguments that the plaintiffs have made is that they contend that there are some self-defense exceptions in certain of the historical place of worship provisions. But the cases that they cite do not actually reflect a statutory self-defense exception. Those cases, Brownlee and Wilforth, nearly recognized and rejected a particular defendant's attempt to assert a common law justification defense. That is not the same thing as concluding that there is an affirmative self-defense exception in any of the statutes, much less concluding that it was an exception that basically swallowed the rule that would allow anyone to carry a gun into a sensitive location at any time simply by asserting that they have an interest in carrying for self-defense. What Bruin and Heller recognized in recognizing the sensitive place doctrine is that the Second Amendment does allow governments to prohibit categorically the presence of firearms in sensitive locations, even if there are people who want to carry firearms in those places for self-defense. Thank you, Your Honors. Good morning, Your Honors, and may it please the Court. John Ohlendorf for the Appellees. The Supreme Court's recent Bruin decision squarely holds that this Court's role in Second Amendment challenges is determined whether the challenge restriction is consistent with the Second Amendment's text and its history. Now here, the plain text of the Second Amendment obviously covers the course of conduct that the plaintiffs wish to engage in and would be engaging in were it not for New York's ban on carrying firearms in places of worship. Plaintiffs are Americans, and they wish to carry bearable arms. Under Bruin, that suffices to shift the burden to New York to establish, based on history, in Bruin's words, that its regulation is consistent with the nation's historic tradition of firearm regulation. Now New York effectively concedes that until 1870, not a single colony, state, territory, city, or town had any restriction on carrying firearms that was specific to places of worship. And even starting in the late date of 1870, the only such laws that New York is able to scrounge together come from a handful of cities, four states, and two territories. And Bruin itself establishes that even those provisions are not reflective of the nation's historical tradition. So are we assuming that all of the other states that did not have such prohibitions thought there was a constitutional right, or just that they didn't have a need or a problem with people bringing guns to churches? Well, Your Honor, number one, it is the state's burden to come forward to show a historic tradition that they get to regulate in these spaces. Does that make a difference when you're looking at regulations that the state can do? I mean, no state. The Second Amendment didn't have anything to do with states in 1791, right? Well, Your Honor, under Bruin- It's only around the time that these regulations come into play that the state is citing that the Second Amendment even hypothetically applies to the states. Well, Judge- We didn't figure that out until much later. But in 1868, the current historical understanding is that the Bill of Rights almost entirely are applied to the state through the 14th Amendment. Well, Judge, there's a couple of answers to that. First, a number of state courts, my understanding is, did not necessarily agree with the Supreme Court's decision, Barron versus Baltimore, and thought that the Bill of Rights applied to them as sort of a general common law proposition. But more importantly, most states had state analogs to the Second Amendment in their own constitutions, which tracked and, Heller says, helped to define the scope of the preexisting right that's incorporated into the Second Amendment. And that's why Heller and Bruin looked to state practice during this period as the most instructive, the most instructive form of history for determining the scope of the Second Amendment at the time that it was ratified. And if the state wants to come forward with some kind of historical evidence suggesting that, well, nobody is regulating these areas, but we all think we could. Well, but when the states started to impose these regulations about churches, they didn't just do it. They did it. And either no one challenged it, or when someone did challenge it, courts said, in respect to their state constitutions mostly, that's the most ridiculous thing I've ever heard. That was the response, the virtually unanimous response of courts to arguments that were made at the time against these laws. Does that not matter? Yes, Judge Lynch. But if you look at those opinions, for example, state versus English, state versus Hill, those cases are premised on an understanding of the Second Amendment that is militia-centric and that we know from Heller and we know from Bruin is an outlier, at the time even, an outlier understanding of the scope of the Second Amendment. And Bruin says that that significantly lessens the amount of historical weight we can place on those decisions. A state court, a decision by the Texas Supreme Court that says, we think that's ridiculous. You want to carry firearms into church? There's no right to serve in a militia in church. That tells us nothing about the scope of the Second Amendment that we have under Heller and that we have under Bruin. How do we know that isn't the understanding at the time of what the Second Amendment meant? After all, until 2008, that's what the Supreme Court thought about the Second Amendment. Well, Your Honor, that's what selective reading of history that we're engaged in. Judge Lynch, that's what the District of Columbia argued in the Heller case. That's what New York argued in the Bruin case. The Supreme Court has rejected that proposition twice and specifically held in Bruin that the fact that these state take an understanding of the Second Amendment strips them of authority in determining what the historic scope of the Second Amendment is. So, Your Honor, I think the state is left with these laws from four states, two territories, a handful of city ordinances. That's plainly insufficient, Your Honor. We would submit for them to bear their burden under Bruin to justify, to show a historic tradition justifying their law. And just, I want to make sure I understand correctly, although in the next case that we're going to be hearing, we've got a First Amendment argument about this that applies specifically to pastors. I take it that's not your argument. No, Your Honor. You're familiar with it yourself, but that's not an argument that's being made here. My plaintiffs don't have any First Amendment claims. You're arguing just on the Second Amendment. That's right. So that would apply to anybody, not just the pastors or not just someone who had a particular religious belief. Anyone could go into a church with a gun. That's correct, Your Honor. That's our view, certainly. Bruin says to begin with the text, and I do want to address the text. Can I just ask you sort of a big picture question. This entire doctrine, I'm calling it a doctrine, that's addressed in Bruin about presumptively lawful or sensitive places. How does that, in your view, factor into this analysis? Putting aside the question of whether or not places of worship are, in fact, sensitive locations, in general, how does this sensitive location concept affect the analysis? Or is your view that essentially it has no meaning or it has no relevance? Yes, Your Honor. So the way that we view it is Bruin establishes a burden-shifting framework. It begins by placing the burden on the plaintiffs to show that their course of conduct comes within the plain meaning of the text, or what Bruin elsewhere says, the bare text. And the Supreme Court has defined the relevant terms. It's defined who constitutes presumptively the people. It's defined what it means to bear arms. And so in this case, at least, and I think in most cases, it's pretty easy for a plaintiff to meet that threshold showing, which then shifts the burden on to the state to demonstrate a historical tradition supporting its law, either that it falls directly within a type of restriction that was recognized at the founding or that it's sufficiently analogous to that. And sensitive places is one piece of that type of showing that the court has taken it as settled. So how do we decide what is sufficiently analogous? The only things that the Supreme Court tells us, I guess by way of dictum, in Bruin are historically analogous to the only things that they list as sensitive places recognized at the founding, which are basically state capitals, polling places, and courthouses. I'm glad they had courthouses on the list. I'm sure Justice Thomas was too. But the only things they said were analogous were government buildings and schools. They didn't tell us why. I'm not sure I understand why. I mean, a social security office, a post office, is like the state capital? I guess, but I'm not sure why. Schools are like the state capital? I don't know why. The only thing they told us was not analogous is the island of Manhattan. And that gave me some puzzlement because, after all, if we're told also in Bruin that we should look to see whether there's been dramatic technological or sociological change, it seems to me that an 18th century person transported to the island of Manhattan would find that a much more radically different place than anything whatever in his experience, whereas a school would not be. So I'm just puzzled. How do you go about this, in your view? Judgment, a couple of points. First, we do not agree that Bruin holds that much. We don't think it says that schools and all government buildings are analogous. I mean, at least according to the theory that you would have us apply, schools are open, fair game. Your client doesn't care about going into a school with a gun, but if somebody did, Bruin has nothing to say about that. That might be perfectly unconstitutional for the state to regulate guns in schools. Judgment, schools were not presented in Bruin. They're not presented here. There is a separate historical category of laws that prevent students from carrying firearms in schools. Well, in a couple of universities, I thought we weren't looking at just a couple of places under your argument. If there's only two, the University of Virginia, and I forget what the other one was, those which aren't anything like public schools, your same arguments would carve that up. Your Honor, I think there are more than a couple, but the issue of schools is simply not, schools are not regulated by this law. It's not presented in this case. Once again, well, schools are regulated by this law. So one of the things that we have to do here is not just throw out a bunch of thunderbolts. We have to do some kind of analysis that applies to what are sensitive locations and what aren't. And the kind of rule that we make is going to have profound implications, at least until the Supreme Court tells us we're wrong, for all of these kinds of institutions that are governed by this law. And some of them, we're going to have to make these decisions, essentially today, in cases that are being argued today. So I'm really, I don't think you can just say, we're just talking churches here, and we don't have to address the larger problem of how do we go about deciding what are and what are not sensitive locations. Judge Lee, I see I'm over time. May I briefly respond? Yes, please. So, Judge Lynch, let me give you the principle that we would propose for determining what is sufficiently analogous to one of the sensitive places recognized in brewing as obtaining its founding. We think the unifying feature of those locations is that the government provided comprehensive security and that that was both why looking to brew and the how much and the why. That is why there was not a significant burden on the individual right to self-defense in preventing carrying arms in those places because the government had undertook for the people who were present in those places, had taken over the job of being armed and ready in case of confrontation, and we think that's also the why. The reason why firearms could be wholly banned in those locations is that the government had secured them. And there's historical evidence of the types of security that was provided at the founding in these locations in the Center for Human Liberty amicus brief in the Antoniuk case. That's the feature that we believe defines the scope of what's sufficiently analogous today to the sensitive locations at the founding. We think schools fall under a separate historical category, which was, as the Mahoney Area School District versus BL Supreme Court case says, that was the state's in loco parentis authority to act on behalf of the parents when it was dealing with students at the schools. That's the historical category that we see schools falling within, but schools were not presented in brew and they're not presented here. Oh, I'm sorry. Apologies. Good morning, Your Honors. I'm appearing, my name is Brian Crosby. I'm appearing on behalf of Brian Seaman, who is the District Attorney of Niagara County, on a very narrow issue. And the issue here is whether or not the preliminary injunction should be maintained until an ultimate decision is made on the constitutionality of this particular statute. It's our position that the stay is improper and that the judge had sufficient basis to institute a preliminary injunction. Holding that back with the stay puts the District Attorney, our District Attorney in Niagara County, in a conundrum in that he is being asked to potentially prosecute violations of this law if someone goes into a church previously legally carrying a firearm and then if the statute is found to be unconstitutional downstream after the matter has been prosecuted as a Class E felony, then having to relieve in some fashion the prior conviction of what, until this statute went into effect, would be an ordinary law-abiding citizen who would take a firearm appropriately, legally, as Reverend Hardaway indicated he did in a difficult area of the city. I'm not sure I understand. Doesn't your client have discretion over what cases to prosecute? Sure he does. Is it not relevant? Doesn't he, like judges, dealing with what to do in the interim, wouldn't it be a reasonable exercise of prosecutorial discretion to say, look, this is still unsettled? It may be that there's no prohibition on my enforcing this law, but I think at least unless somebody goes in and shoots up the place, in which case we can prosecute them without any question. In the unlikely event that, somebody's going to make a test case just to test your client up there, why is there not just discretion to say, I'm going to stay my hand at least on, I don't even know what he has to say on what at this point. We'll wait and see what happens. Well, I think then what you're suggesting, Your Honor, and what the state has suggested in their responsive brief is that the district attorney, in essence, substitute himself for the court and de facto issue an injunction until the decision is made. No, he's not doing anything involving injunctions. He's not binding anybody else. He's not even telling the police what to do, I take it. He's doing what district attorneys do all the time. Of the many categories of offenses that exist under the law, he's deciding which ones are worthy of prosecution. And if he sees one that he thinks is worthy of prosecution, he can bring it. And nothing, at least at the moment, stops him from doing so. If there was an injunction against him, then he couldn't. Now he can, or if he thinks it's an appropriate prosecution to bring, and if he thinks it's not, I don't see what obligates him to bring a case. Well, he is sworn to uphold the law. He is sworn to uphold this law, and the state has indicated that they intend to arrest and go forward with this arrest. Well, why does a district attorney rely on a principled basis on the rule of lenity, which says if there's some controversy as to whether this law applies or should apply or can be prosecuted, you don't do it? Well, I think, I guess my reaction to that, Your Honor, is you're telling the district attorney if you have people who are charged with e-felonies, and the state troopers have come forward and indicated that they have a clear case of a violation of an e-felony, that he should stand back until the decision is made by this court. No one's saying he should. That's his discretion. That's his power. That's his authority. I'm sure there are other cases where police officers bring him cases of e-felonies, and the decision is, eh, no, we're just not going to do that. And they don't. Isn't that right? I mean, isn't that what district attorneys do? That's their job, is to decide what cases are worthy of prosecution in their view. And if they have constitutional reservations, they're also obliged to follow those, at least until some court tells them you must do this or you must do that. Well, I believe, Your Honor, that that puts a district attorney in a very difficult decisional position. That's why they pay him the big bucks. I used to do that for a living at one time. And we were making decisions all the time that were hard, difficult decisions about what cases were worthy of prosecution and what weren't. And some of those were based on the determination that we have limited resources, some laws are more important than others, and we have to put our resources where it counts and not where it doesn't. I mean, it seems to me like the whole job of the man. Well, I guess my reaction to that, Your Honor, is that the prosecutor would be bound to follow the law to prosecute clear cases that are felony violations. In Germany that's true. I mean, in many European countries there's what's called the rule of compulsory prosecution. But that's never been the rule in the United States with respect to district attorneys. They can decide to exercise mercy in particular cases and not bring them. And no one can bring a lawsuit to make them. A victim can't make the district attorney bring a prosecution if the prosecutor decides, well, this is a clear case of shoplifting, but the guy's sorry and he's poor and we've got bigger fish to fry, there are murders to prosecute. We're just going to let that go. The store owner can't bring a lawsuit to enjoin the prosecutor to prosecute the case. Isn't that correct? That is correct, Your Honor. Okay. Thank you. Thank you. Hello. I'd like to make three points on rebuttal. The first is that when you apply the historical twins framework for analyzing comparable sensitive place regulations, the plaintiff's test provides no workable standard. They've said laws from four states, two territories, and multiple local ordinances are not enough. If that is not enough, I don't know what is. And that test would turn Bruin into the regulatory straitjacket that the Supreme Court warned against. Second, Bruin itself does not actually require historical twins. It urges courts to adopt principles of relevant similarities in analyzing modern laws. What the plaintiffs have suggested is that the principles of relevant similarity must look only to the list of sensitive places listed in Bruin. That is actually not consistent with Bruin. Bruin uses the phrase E.G. before making that list, which is commonly understood not to be exclusive. Bruin says this is not an occasion to comprehensively define sensitive places. If you look to the historical statutes that set out sensitive places, they are much, much broader than the list that is set forth in Bruin. And many of them do, in fact, date to the late 19th century or to the middle of the 19th century. The sources that Bruin itself cited to support the sensitive places it recognized referenced 19th century prohibitions on firearms in places like legislative assemblies and courthouses. If 19th century statutes were irrelevant, then that portion of Bruin would simply not make sense. The third point that I would like to make is about what to do with founding-era asylums. Well, Your Honor, Bruin does suggest that there is a time when statutes that are too late are too removed from the historical period. But even then... How do I know when that is? Well, but even then, the Court does not say that the rule is to exclude consideration of those statutes. What the Court says is that if those statutes are inconsistent with affirmative evidence on the other side from an earlier time period, then they are less relevant evidence of the historical meaning of the Second Amendment. What the Court does not say is that those later laws, whether from the 19th century or early 20th century, can be categorically discarded in the face of founding-era asylums. That does not make any sense. Because to impose that kind of rule, or to apply a presumption of constitutionality that presupposes that legislatures are governing at the maximum extent of their constitutional authority at every single time. That has never been a presumption that courts have applied in the Second Amendment or any other context. Thank you. Thank you. We'll take this matter under advisement.